**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| NEIL L. RANLY, | : | Case No. 3:14-cv-00334 |
| | : | |
| Plaintiff, | : | Magistrate Judge Sharon L. Ovington |
| | : | (by full consent of the parties) |
| vs. | : | |
| | : | |
| COMMISSIONER OF THE SOCIAL | : | |
| SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

---

## DECISION AND ENTRY

---

## I.    <u>Introduction</u>

This social security case is was previously remanded to the Social Security

Administration under the sixth sentence of 42 U.S.C. § 405(g) for further proceedings in

light of new and material evidence concerning Plaintiff's impairments.  On remand,

Administrative Law Judge Eric Anschuetz issued a decision concluding that Plaintiff was

not under a disability and, therefore, not eligible to receive Supplemental Security Income

or Disability Insurance Benefits.  Plaintiff has returned to this Court contending that ALJ

Anschuetz erred by failing (1) to credit the opinions of his long-term treating neurosurgeon

Dr. Minella, (2) to find that his carpal tunnel syndrome constitutes a severe impairment, and

(3) to properly measure his credibility.  The Commissioner finds no error in, and substantial

evidence supporting, the ALJ's decision and, therefore, seeks an Order affirming his

decision.

## II.    Background

### A.    Plaintiff and His Lumbar Spine Problems

Plaintiff asserts that he has been under a "disability" since September 16, 2011.  He was 35 years old on that date and was therefore considered a "younger person" under Social Security Regulations.  He is high-school graduate and has worked in the past as a laborer, a machinist, on truck driver, and a warehouse driver.

An EMG on August 23, 2010 showed Plaintiff had mild chronic L5-S1 radiculopathy on the right.  Beginning in September 2010, neurologist Dr. Krousgrill examined Plaintiff for lumbar and cervical spine impairments.  She diagnosed Plaintiff with L5-S1 radiculopathy, right L5-S1 neural foraminal stenosis, and lumbar arthritis.  She prescribed medication, physical therapy, TENs unit and ultrasound.  (Doc. #4, *PageID* #s 829-30).

On five occasions between September 2010 and November 2010, emergency room physicians evaluated and treated Plaintiff with pain medication for chronic uncontrolled back pain with related lower extremity.  Examinations revealed tenderness to palpation along his lumbar and sacroiliac areas, decreased range of motion, and positive straight-leg raises.  *Id*. at 581, 598, 602.

An October 2010 MRI of Plaintiff's lumbar spine showed disc bulges at L3-L4 and L4-L5 and L5-S1; central canal stenosis at L3-L4; and at L5-S1 questionable left S1 nerve root contact as well as foraminal narrowing.  *Id*. at 520-21.

In November 2010, interventional radiologist, Dr. Syed, evaluated Plaintiff for severe low back pain with radiation into bilateral lower extremities.  Upon examining Plaintiff, Dr. Syed noted positive straight-leg raises and Fabere Maneuver, bilaterally.  He treated

Plaintiff with a series of epidural steroid injections under fluoroscopic guidance. *Id*. at 529-30, 533-34.

Also in November 2010, orthopedist Dr. Hoskins evaluated Plaintiff for right-sided low-back pain and associated lower-extremity symptoms. He referred Plaintiff to a pain-management specialist and physical therapy. *Id*. at 642-44.

In mid-November 2010, Plaintiff first saw neurosurgeon Dr. Minella for surgical consultation. Dr. Minella noted decreased pinprick in a right C6-C7 distribution, but he thought that Plaintiff was not "a great surgical candidate" because he had too many symptoms and recommended pain management. *Id*. at 701.

In late December 2010, a pain-management specialist, Dr. Mathai, initially examined Plaintiff for low-back pain and right-leg symptoms. She assessed Plaintiff with displacement of his lumbar spine and degeneration of his lumbar discs at multiple levels. *Id*. at 800-02. In her subsequent examinations through May 2011, Dr. Mathai noted decreased and painful lumbar range of motion with tenderness, antalgic gait, positive bilateral straight leg raises and hyperpathia, right more than left, and sacroiliac joint tenderness. *Id*. at 787, 797, 801.

Dr. Mathai diagnosed displaced lumbar disc, multilevel lumbar degenerative disc disease and possible peripheral neuropathy. *Id*. at PageID#801; *see PageID*#s 787, 797. Dr. Mathai performed several procedures between December 2010 and June 2011, including lumbar-epidural blocks, right sacroiliac-joint injections, right, and bilateral-facet blocks. Some helped temporarily, but all failed to provide Plaintiff with ongoing relief. *Id*. at 788-98, 894.

In March 2011, a lumbar MRI showed disc bulges at T11-12, L2-3, L3-4, L4-5 (with central annular tear) and L5-S1; lateral or central canal stenosis at T11-12, L3-4, L4-5 and L5-S1 (with material approaching the left S1 nerve root); hypertrophic changes between L1-2, and L5-S1; and foraminal narrowing between L2 and L5. *Id*. at 1149. A radiologist diagnosed Plaintiff with multi-level spondylosis most severe at L3-4, L4-5 and L5-S1. *Id*.

In late March 2011, Plaintiff again saw Dr. Minella for low-back and bilateral-leg pain, right more than left. Dr. Minella explained, "Certainly a fusion could be done from L3 to the sacrum, however I certainly could not guarantee that this would get rid of all his symptoms. I would be concerned that he might feel that he's worse than he was previously. Therefore I cannot strongly recommend surgery." *Id*. at 893.

When Plaintiff saw Dr. Minella in December 2011, he reported that his symptoms had "worsened, as they were mild and now are described as unbearable …." with pain, numbness and tingling. *Id*. at 1053. On examination, Dr. Minella noted decreased sensation of both legs in an L3, L4, L5 distribution. They discussed surgery—a fusion from L3-S1. Plaintiff decided to proceed with the surgery.

In April 2012, before Plaintiff underwent surgery, an MRI showed "no substantial change" compared to his previous MRI (taken on March 22, 2011). *Id*. at 1044-45. Also at this time, Dr. Minella completed a "Short Work Questionnaire" indicating that Plaintiff, at most, could perform part-time sedentary work. *Id*. at 1157-58.

On June 7, 2012, Dr. Minella, performed a laminectomy of L3, L4 and L5 and fusion with rod and screw fixation. Diagnoses at that time included lumbar radiculopathy, chronic back and bilateral leg pain (left more than right), lumbar stenosis, and surgical

instability. *Id*. at 1073-1086, 1093-1102.

On June 12, 2012, Dr. Minella documented Plaintiff's post-operation status, writing: "On exam today, he states he doesn't feel too bad. He has some right leg pain. His incision is healing well and we removed staples. At this point, he will continue his recovery and return to my office in four weeks for reevaluation." *Id*. at 1161. On July 18, 2012, Dr. Minella again saw Plaintiff and explained, "He is doing well. Sitting does cause him some leg pain…." *Id*. at 1160. Dr. Minella next saw Plaintiff on September 19, 2012. Dr. Minella reported, "He states overall he feels good, other than some pain when sitting. I reviewed his lumbar spine x-ray today which looks good. He may continue the brace at this time and return to my office in three months for reevaluation." *Id*. at 1159.

In January 2013, Dr. Minella noted, "Seven months post op, coping well, with some leg dysesthesias.[1] He will continue on Tramadol and Robaxin…." *Id*. at 1185 (footnote added). In June 2013, Mr. Ranly reported right leg pain for the past week, although better, it was still at a pain level of 5/10. *Id*. at 1214. Upon inspection and palpation, Dr. Minella observed that Plaintiff's "muscle tone [was] equal, without atrophy, without spasticity, no abnormal movement. *Id*. at 1216. He noted that lumbar spine x-rays on May 5, 2013 were "ok." *Id*. Nevertheless, Dr. Minella recognized that Plaintiff remained in pain (again, 5/10) and he referred Plaintiff to pain management. *Id*. at 1214, 1217.

On November 11, 2015, Mr. Ranly was treated for back pain at the emergency room. Treatment notes relate that his pain "is moderate in degree and in the area of the right lower

---

[1] "Dysesthesia" is defined as "[a]bnormal sensations on the skin, such as feeling of numbness, tingling, prickling, or a burning or cutting pain." <u>Taber's Cyclopedic Medical Dictionary</u>, p. 623 (19th Ed. 2001).

lumbar spine and right SI joint and radiation to the right lower extremity." *Id*. at 1652. He was diagnosed with "chronic nontraumatic lumbar back pain associated with muscle strain." *Id*. at 1653. He was discharged home with prescriptions for Toradol and Norflex.

## B. Plaintiff's Cervical Spine

In August 2010, a cervical-spine MRI found mild central stenosis at C4-C5, C5-C6 and C7-T1. Joint arthropathy resulted in bilateral foraminal narrowing at C4-C5 and C5-C6. And straightening of the normal cervical lordosis was noted due to either muscle spasm versus positioning. *Id*. at 523-24. Upon consultation in November 2010, radiologist Dr. Syed reported that Plaintiff's August 2010 MRI of his cervical spine without IV contrast "demonstrates mild degenerative disc disease at C4-C5 as well as C7-T1 with mild central stenosis at these levels…." *Id*. at 533. Dr. Syed also noted that Plaintiff had mild bilateral foraminal narrowing at C4-C5 and moderate left neuroforaminal narrowing at C5-C6. And he wrote, "There is straightening of the normal cervical lordosis, which may be due to muscular spasm versus positioning." *Id*.

In December 2010, pain management specialist, Dr. Mathai, initially examined Plaintiff for neck pain radiating into his arm and hands as well as weakness and numbness. Dr. Mathai diagnosed Plaintiff with myofascial neck pain; and "Displacement of the cervical disc with mild central canal stenosis and facet joint arthropathy." *Id*. at 800-01. Dr. Mathai saw Plaintiff eleven times through June 2011. *Id*. at 788-98.

In August and September 2011, saw treating neurosurgeon, Dr. Minella whose examination revealed pain with neck motion with radiation into the right arm, normal muscle strength, and decreased pinprick in the right arm with tingling in a C6 distribution.

*Id*. at 892.

A cervical-spine MRI in August 2011 showed: disc protrusions or herniations at most levels between C3-7 and T1-3 and T1-T2; and mild to moderate foraminal narrowing at several levels C3-C6. *Id*. at 961.

A November 17, 2011, treating neurologist, Dr. Krousgrill, noted muscle spasms of the cervical paraspinal and bilateral trapezius, as well as "marked tenderness" along the neck and shoulder. *Id*. at 998. In February 2013, a cervical MRI remained much the same as the August 23, 2011, study save for a larger disc protrusion at C4-5. *Id*. at 1199-1200. And a February 2013 EMG of Plaintiff's upper extremities was positive for chronic left ulnar mononeuropathy at the elbow with focal demyelination conduction slowing, and evidence of earlier axon loss and "motor unit remodeling." *Id*. at 1198-99.

On February 20, 2013, Dr. Minella evaluated Plaintiff. His examination revealed positive Tinel's sign at the right elbow. Dr. Minella recommended six weeks of pain management for spondylosis and foraminal stenosis at C4-5, C5-6, and C6-7. *Id*. at 1203.

Dr. Minella performed trigger-point and cervical-facet injections in March 2013, and a second facet block in May 2013. *Id*. at 1215,1221-25. In late May 2013, Plaintiff informed Dr. Minella that pain management offered only temporary help. *Id*. at 1217. Dr. Minella diagnosed cervical spine spondylosis and foraminal stenosis at C4-5, C5-6, and C6-7, with cervical radiculopathy. He recommended surgery. *Id*. at 1220.

On July 30, 2013, Dr. Minella performed an anterior cervical discectomy, fusion, and plating of C4-C5, C5-C6, C6-C7 with Triad bone and Atlantis Vision plating. *Id*. at 1646-47.

Plaintiff had a cervical x-ray in April 2015, showing mild foraminal narrowing, most prominent at C4-5. *Id.* at 1603-04. He also had an MRI of his cervical spine. A radiologist compared it to Plaintiff condition before his cervical-spine surgery and reported that it revealed improvement of his central canal dimensions cervical fusion from C4 down to C7. At the C3-4 level, there was mild central stenosis due to broad-based disc bulge. *Id.* at 1606-07.

## III.    <u>**"Disability" Defined And The ALJ's Decision**</u>

The Social Security Administration provides Disability Insurance Benefits and Supplemental Security Income to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §§ 423(a)(1), 1382(a). The term "disability"—as defined by the Social Security Act—has specialized meaning of limited scope. It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job—i.e., "substantial gainful activity," in Social Security lexicon. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see Bowen,* 476 U.S. at 469-70.

As noted previously, it fell to ALJ Anschuetz to determine whether Plaintiff was under a benefits-qualifying disability. He did so by addressing the 5 sequential steps required by the Regulations. *See* 20 C.F.R. §§ 404.1520, 416.920. The ALJ determined at step 2 that Plaintiff had the many severe impairments, namely:

> degenerative disk disease of the cervical spine, with the residuals of a spinal fusion; degenerative disc disease of the lumbosacral spines, with the residuals of a spinal fusion; degenerative joint disease of the right knee with the residuals of surgery; exogenous obesity; depression; and anxiety.

(Doc. #15, *PageID* #1343). The ALJ found at step 3 that Plaintiff's impairments did not automatically constitute a disability under the Commissioner's Listing of Impairments. *Id.* at 1345.

At step 4, the ALJ found that the most Plaintiff could do despite his impairments—his residual functional capacity, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002)—was sedentary work subject to the following limitations:

> [He] can lift ten pounds occasionally and ten pounds frequently. In addition, [he] can stand and/or walk for a total of four hours during an eight-hour workday; and sit for a total of six hours during an eight-hour workday. [He] can never climb ladders, ropes, or scaffolds, but can occasionally climb ramps and stairs. Occasional bending, stooping, kneeling, crouching, and crawling. [He] must avoid workplace hazards such as unprotected heights or unshielded rotating machinery. Due to mental impairments, [he] is limited to performing simple, routine, repetitive tasks, but not at a production rate. No greater than occasional interaction [sic] supervisors, co-workers, and the public.

*Id.* at 1346.

At step 5, the ALJ concluded that Plaintiff could perform a significant number of jobs that exist in the national economy. *Id.* at 1350. These main findings led the ALJ to ultimately conclude that Plaintiff was not under a benefits-qualifying disability.

## IV.    Standards of Review

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence

contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance . . . ." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746.

## V.    Discussion

The parties' dispute over ALJ Anscheutz's weighing of Dr. Minella's opinions focuses on his reasoning. The ALJ placed "some but not significant weight" on Dr. Minella's opinion on April 13, 2012 that Plaintiff's lumbar spine impairments would prevent him from working for over 24 months. (Doc. # 4, *PageID* #s 1152, 1347). ALJ Anschuetz reasoned that this opinion "was speculative at best, and lacks any objective support. Later treatment notes showed that [Plaintiff] demonstrated significant improvement following his low back surgery." *Id*. at 1347. The ALJ placed little weight on Dr. Minella's opinion on April 1, 2012 that Plaintiff could perform only part-time sedentary work on a sustained basis because "Dr. Minella provided no explanation of his medical

opinion." *Id.* (citing Social Security Ruling 96-20).

      The Commissioner contends that the ALJ's reasoning is "sufficiently clear such that is can be meaningfully reviewed even if it was not structured or discussed in exactly the same manner as this Court suggested in *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365 (2013)." (Doc. #21, *PageID* #1829). Although this is not an explicit acknowledgment that the ALJ failed to follow the Regulations, it is also not a wringing endorsement. This is readily understandable because the ALJ's places the Commissioner in the position of supporting a decision crowded with several errors. First, when weighing Dr. Minella's opinions, the ALJ made no mention of the treating physician rule or, more importantly, the specific legal criteria that the Regulations spell out for determining whether Dr. Minella's opinions are due controlling weight. The legal criteria are well established: "(1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic technique'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart*, 710 F.3d at 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2)). Second, the ALJ gave such short shrift to Dr. Minella's opinions that there is no indication he considered Dr. Minella's opinions as generally due greater deference due to his status as a treating physician. *See* 28 C.F.R. § 404.1527(C)(2) ("Generally, we give more weight to opinions from treating sources …."); *see also Rogers,* 486 F.3d at 242 (citations omitted) ("greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians…." (citation omitted)). This is also seen in the ALJ's glancing references to lack of objective support and lack of explaining without any meaningful attempt to review Dr. Minella's opinions in two stages—

as the Regulations mandate. If the treating physician's opinion is not controlling, "the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544). The ALJ's reasoning simply runs afoul of the principle that "in all cases here remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference, its non-controlling status notwithstanding." *Id.* (citing and parenthetically quoting Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *4 ("In many cases, a treating physician's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.")).

Third, substantial evidence does not support the ALJ's conclusions that Dr. Minella's opinion was speculative at best and "lacks <u>any</u> supporting objective evidence." (Doc. #4, *PageID* #1347 (emphasis added)). There is plenty of objective evidence and examination findings demonstrating that Dr. Minella's opinions in April 2012 were not speculative. This evidence is described above, *supra*, §§ II(A)-(B), but a few highlights are worth identifying. Lumbar MRI studies in October 2010, showed multi-level disc bulges between L3 and S1, with stenosis a questionable left S1 nerve root contact. (Doc. #4, *PageID* #s 520-21). Dr. Syed's examination of Plaintiff in November 2010 revealed positive straight-leg raises and Fabere Maneuver, bilaterally. Additional support for Dr. Minella's opinions can be found in his 2011 exam findings, which included sacroiliac joint tenderness; decreased and painful range of motion with tenderness; and decreased sensation of both legs in an L3, L4, L5

distribution. *Id*. at 787, 797, 951. Plaintiff's lumbar spine did not respond well to epidural injections, so Dr. Minella ordered an updated MRI. *Id*. at 700. The lumbar MRI, dated March 22, 2011, revealed worsening since Plaintiff's previous MRI and showed disc bulges at more levels; an annular tear at L5-S1; multi-level-canal stenosis, hypertrophic changes, foraminal narrowing; and multi-level spondylosis, most severe at L3-4, L4-5 and L5-S1. *Id*. at 1149-50.

All this evidence led to the laminectomy and fusion surgery Dr. Minella performed on Plaintiff's lumbar spine in June 2012. The surgery involved, among other things, rod and screw fixation. Diagnoses included lumbar radiculopathy, chronic back and bilateral leg pain (left more than right), lumbar stenosis, and surgical instability. *Id*. at 1073-86, 1093-1102. Although the ALJ found that treatment notes after the surgery show significant improvement in Plaintiff's lower back, Dr. Minella's notes about Plaintiff's improvement do not use the word "significant" and the information they provide is not probative, or minimally probative, of how much the surgery reduced Plaintiff's back pain or whether he could engage in work activities. *See id*. at 1159-61. The ALJ also overlooked that Dr. Minella's treatment notes continued to document Plaintiff's lumbar-spine pain. In June 2013, for instance, Dr. Minella noted that Plaintiff was having both cervical and lumbar pain and gait problems. *Id*. at 1214.

The ALJ's brief discussion of Dr. Minella's opinions does not mention Plaintiff's cervical-spine problems, which Dr. Minella ended up treating with surgery. An August 2010 cervical MRI showed central canal stenosis at C4-5, C5-6 and C7-T1; joint arthropathy resulted in bilateral foraminal narrowing at C4-C5 and C5-C6; and straightening of the

normal cervical lordosis. *Id*. at 523-24. Abnormal objective exam findings in 2010 included decreased pinprick sensation in a right C6-C7 distribution; tenderness to palpation along mid-cervical spine with spasm; cervical decreased range of motion; Tinel's signs— bilaterally and numbness along the median nerve distribution into the hand; and positive neck-compression test. *Id*. at 606, 642-44, 701, 800-01, 830, 833, 958. A cervical MRI in August 2011 showed disc protrusions or herniations at most levels between C3-7 and T1-3 and T1-T2; and mild to moderate foraminal narrowing at several levels C3-6. *Id*. at 961.

During 2011, treating and examining sources noted that Plaintiff had cervical pain with neck motion with radiation into the right arm; decreased pinprick with along the right arm in a C6 distribution; muscle spasms of the cervical paraspinal and bilateral trapezius; and "marked tenderness" along the neck and shoulder. *Id*. at 892, 953, 955, 998. Dr. Minella's 2013 examination indicated Tinel's sign was positive at the right elbow. *Id*. at 1203. After conservative treatment failed to ameliorate Plaintiff's cervical pain, Dr. Minella recommended cervical fusion from C4 to C7. *Id*. at 1217, 1220. In July 2013, Dr. Minella performed an anterior cervical discectomy, fusion, and plating of C4-C5, C5-C6, C6-C7 with Triad bone and Atlantis Vision plating. *Id*. at 1646-47. Yet problems continued: An April 2015, a cervical MRI showed mild central stenosis due to broad-based disc bulge at the C3-4 level just above the fusion site. *Id*. at 1606-07.

The ALJ also failed to address the consistency between the reports and opinions provided by Dr. Minella and Dr. Krousgrill. Notes from Dr. Krousgrill in 2010 and 2011 reference Plaintiff's low-back pain and associated decreased-pinprick sensation in both legs. Dr. Krousgrill observed that Plaintiff was stiff when standing, tended to walk in a forward-

tilt position, and walked with a limping gait due to back pain. *Id*. at 826-30. In November 2011, Dr. Krousgrill, examined Plaintiff and reported that he had muscle spasms of the cervical paraspinal and bilateral trapezius, as well as "marked tenderness" along the neck and shoulder. *Id*. at 998. Such information tends to support Dr. Minella's opinions.

Contrary to the Commissioner's argument, in light of the above evidence and the ALJ's superficial consideration of Dr. Minella's opinions, his decision does not contain good reasons for discounting this long-term treating specialist's opinions. At best for the Commissioner, the arguments raise the possibility that the ALJ's errors were harmless. But given the evidence discussed above, the ALJ's failure to provide good reasons for the weight he placed on Dr. Minella's opinions did not constitute harmless error. *See Wilson*, 378 F.3d at 546 ("The ALJ's error is 'not made harmless simply because [the aggrieved party] appears to have had little chance of success on the merits anyway.'" (brackets in *Wilson* )).

The ALJ also placed little weight on the opinions of pain-management specialist, Dr. Mathai, who thought that Plaintiff could work on a part-time basis. The ALJ believed that Dr. Mathai based her opinion "on an uncritical acceptance of [Plaintiff's] subjective pain complaints." *Id*. This completely misses the significance of the information Dr. Mathai gained upon her examinations of Plaintiff. In her examinations through May 2011, Dr. Mathai noted decreased and painful lumbar range of motion with tenderness, antalgic gait, positive bilateral straight leg raises and hyperpathia, right more than left, and sacroiliac joint tenderness. *Id*. at 787, 797, 801.

Dr. Mathai diagnosed displaced lumbar disc, multilevel lumbar degenerative disc

disease and possible peripheral neuropathy. *Id*. at 801; *see PageID*#s 787, 797. She performed several procedures between December 2010 and June 2011, including lumbar-epidural blocks, right sacroiliac-joint injections, right, and bilateral-facet blocks. Some helped temporarily, but all failed to provide Plaintiff with ongoing relief. *Id*. at 788-98, 894. Given this evidence, and the ALJ's omission of any citation in support of his conclusion that Dr. Mathia uncritically accepted Plaintiff's subjective pain reports, substantial evidence does not support the ALJ's weighing of Dr. Mathia's opinions.

All this leads to the ALJ's evaluation of Plaintiff's subjective descriptions of his pain and other symptoms—a critical component of determining a person's ability to work despite his or her impairments. *See* 20 C.F.R. § 404.1529(c). "Subjective complaints of 'pain or other symptoms shall not alone be conclusive evidence of disability.'" *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (quoting, in part, 42 U.S.C. § 423(d)(5)(A)). When the claimant's medical records, as in the present case, contain objective medical evidence of an underlying medical condition, the question becomes, "whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." *Id*. (quoting *Duncan v. Sec'y of Health & Human Servc.*, 80 F.2d 847, 853 (6th Cir. 1986)).

"[A]n ALJ's findings based on the credibility of the applicant are ... accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997) (citing *Villarreal v. Sec'y of Health & Human Servs.,* 818 F.2d 461, 463 (6th Cir. 1987)); *see Cruse v. Comm'r of Soc. Sec.,* 502 F.3d 532, 542 (6th Cir. 2007). Still,

substantial evidence must support an ALJ's credibility assessment. *Cruse,* 502 F.3d at 542 (citing *Walters,* 127 F.3d at 531).

ALJ Anscheutz summarized his findings at step 4 of the sequential analysis. He wrote:

> In sum, the above-referenced residual functional capacity is adequate to address the location, duration, frequency, and intensity of [Plaintiff's] bona fide symptoms, as well as any reasonably anticipated aggravating and precipitating factors. It is found that [Plaintiff's] allegations and subjective complaints are not fully consistent with the evidence.

*Id.* at 1349.

To the extent the ALJ required Plaintiff's hearing testimony to be "<u>fully</u>" consistent with the evidence, this was legal error because, as a matter of law, this effectively creates and imposes a higher burden of proof than the Regulations require. The Regulations in place at the time of the ALJ's decision promised applicants for social security benefits, "In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence…." 20 C.F.R. § 404.1529(a). The ALJ's "fully consistent" standard conflicts with this Regulation and did not address the crucial question: Whether Plaintiff's descriptions of his pain and resulting limitations were reasonably consistent with the objective and other evidence. *Id.*; *see Buxton*, 246 F.3d at 773.

In addition, the ALJ at step 4 observed that Plaintiff's "impairments do not significantly restrict his activities of daily living, as previously discussed above." (Doc. #4, *PageID* #1348). The ALJ's reference to the daily activities previously discussed above is

somewhat misleading.  The only previous mention of Plaintiff's daily activities appears at step 3 of the ALJ's sequential analysis where he reviewed Plaintiff's mental impairments.  Here the ALJ found:

> The record indicates that [Plaintiff] is independent in self-care.  He was able to take care of his child and step-child.  He did some light household chores.  [He] had a driver's license and was able to drive himself to medical appointments.  He spent a typical day listening to music, practicing his keyboarding, and spending time on the computer.  He enjoyed working on crossword puzzles as a hobby (Exhibit 11F).  [He] testified at the hearing that he helped out with laundry and did some yard work.

*Id*. at 1345.  These findings, however, exaggerate Plaintiff's descriptions of his daily activities and is not supported by substantial evidence.  He testified in September 2016 that although he used to love to cook, he no longer cooks.  Instead, he microwaves something, or eats left overs or a cold meat sandwich.  (Doc. #15, *PageID* #1397).  He mows the lawn for 5 or 10 minutes before he stops, sits in a chair, and stretches out.  *Id*. at 1398. His stepdaughter—who was age 14 at that time—helped him a lot with the mowing.  He further testified that he occasionally uses a "grabber" to pick up cans or bottles that passersby throw on his lawn.  *Id*.  1382-83.  Common sense says that this activity does not require him to bend over.

Pain in his back and knee sometimes causes him to need help putting on his socks and shoes.  He can sit for about 20 minutes before he needs to stand and stretch; he can stand for 15 to 20 minutes.  He tries to walk around the block, which takes about 15 minutes, but if he pushes it beyond that he would need to lie down for the rest of the day.  *Id*. at 1399.  He drives infrequently—about once a week—and doesn't drive far.  *Id*. at 1400.  Although he drove 48 miles to the location of the ALJ's hearing, he needed to stop so he

could get out of the car and walk around for a few minutes. *Id*.

He testified that he does not spend time using the computer but uses a Kindle because he can read it while in bed. *Id*. at 1381. He further testified that he tries "to do a little laundry," but does not describe what this involves. Plaintiff also noted that he when he last saw Dr. Africk "to find out [if] I have to have surgery again, she put me on more restrictions than I was before. I'm not allowed to ride a lawnmower, or golf cart, or anything like that." (Doc. #15, *PageID* #1394).

Because the ALJ did not accurately describe Plaintiff's testimony about his daily activities and because the ALJ was overly selective when evaluating Plaintiff's daily activities, his view of Plaintiff's testimony was unreasonable and without substantial evidentiary support. "[A] substantiality of evidence evaluation does not permit a selective reading of the record. 'Substantiality of the evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'" *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (quoting, in part, *Garner v. Heckler,* 745 F.2d 383, 388 (6th Cir. 1984)) (internal citations and quotation marks omitted).

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.

## VI.     <u>Remand</u>

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial

right. *Bowen*, 478 F.3d at 746. Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is warranted in the present case because the evidence of disability is strong while contrary evidence is lacking. The record contains strong objective evidence, detailed above, *supra*, §II, that documents the disabling extent of Plaintiff's lower back pain and his need for lumbar surgery on June 7, 2012. On this date, Dr. Minella performed a laminectomy of L3, L4 and L5, and fusion with rod and screw fixation. Plaintiff's lumbar spine remains fused and contains this hardware, at least as to the date of the most recent medical evidence in the administrative record. The objective medical evidence likewise establishes the disabling condition of Plaintiff's cervical spine and the

need for Dr. Minella to perform surgery on July 30, 2013.  Dr. Minella performed an anterior cervical discectomy, fusion, and plating of C4-C5, C5-C6, C6-C7 with Triad bone and Atlantis Vision plating.  *Id*. at 1646-47.  Plaintiff's cervical spine remains fused and contains this hardware, at least as to the date of the most recent medical evidence in the administrative record.  This strong objective evidence doubtlessly played a large role in leading the ALJ to conclude that Plaintiff could perform only a limited range of sedentary work.  *See* Doc. #4, *PageID* #1347 (concluding that evidence after the record-reviewers submitted their opinions showed Plaintiff could not perform a reduced range of light work). In addition, excluding the record-reviewing physicians' opinions—which the ALJ gave only some but not significant weight—no physician of record indicated that Plaintiff could perform sedentary work with the limitations the ALJ identified.  Although it fell to the ALJ to make the final assessment of Plaintiff's residual functional capacity, *see* 20 C.F.R. § 404.1527(d)(2), substantial evidence must support his assessment, s*ee Blakley*, 581 F.3d at 407.  Substantial evidence does not support the ALJ's conclusion that Plaintiff could perform sedentary work limited to standing and/or walking four hours during an 8-hour workday, and sitting for a total of 6 hours during an 8-hour workday.  These limitations do not adequately account for the opinions and records of Plaintiff's treating neurosurgeon, Dr. Minella, or the opinions and records of Dr. Matthias.  This evidence, moreover, is wholly consistent with Plaintiff's testimony about his limitations in standing, walking, and sitting. And, the vocational expert testified during the ALJ's hearing that no jobs would be available to a hypothetical person who could perform sedentary work but needed to lie down as often as Plaintiff.  (Doc. #15, *PageID* #1410).  The vocational expert, moreover, testified, "I've

talked to literally thousands of employees and they—even though it's your break time technically, they kind of frown upon a person actually lying down even if it's their break. I'm not going to say that they would get fired from the job if they did that, but it's typically frowned upon, and I think that it's problematic in the end." *Id*. The vocational expert similarly testified that a hypothetical person who could sit only 20 minutes before needing to stand, and would be off task while standing, would be unable find a job. *Id*. at 1411-12 ("I believe there'd be no work for that person.").

Lastly, this is an unusual case considering its age—more than 7 years old—and the fact that a remand for further proceedings would require a third decision by an Administrative Law Judge (unless the Appeals Council remanded for benefits). In these circumstances and given the strong evidence of disability while contrary evidence is lacking, there is no just reason to further delay this matter for even more administrative proceedings. *See Gentry*, 741 F.3d at 730 (remanding for benefits after 2 remands and 3 administrative hearings and finding, "In light of the extensive opinions of treating physicians as to the severity of Gentry's psoriasis and psoriatic arthritis, we conclude that substantial evidence on the record as a whole supports a finding of total disability."); *see also Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) ("Allowing the Commissioner to decide the issue again would create an unfair 'heads we win; tails, let's play again' system of disability benefits adjudication." (other citation omitted)); *Wilder v. Apfel*, 153 F.3d 799, 804 (7th Cir. 1998) ("Given the obduracy evidenced by the action of the administrative agency on remand, we remand the case to the agency with directions that the application for benefits be granted."); *Randall v. Sullivan*, 956 F.2d 105, 109 (5th Cir. 1992)

("Because of the medical record, we think it unconscionable to remand this eight year old case to the Secretary for further review.").

### IT IS THEREFORE ORDERED THAT:

1. The ALJ's non-disability decision is reversed;

2. This matter is remanded to the Social Security Administration under the fourth sentence of 42 U.S.C. §405(g) for payment of benefits based on the disability onset date of September 16, 2011;

3. The Clerk of Court shall enter Judgment in favor of Plaintiff and against Defendant; and

4. The case is terminated on the docket of this Court.

June 25, 2019                          *s/Sharon L. Ovington*
                                        Sharon L. Ovington
                                        United States Magistrate Judge